THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

HARVEY E. YATES COMPANY,
JALAPENO CORPORATION, and
YATES ENERGY CORPORATION,

        Plaintiffs,

v.

                               No. Civ. 12-857 JH/SMV

CIMAREX ENERGY CO.,

        Defendant.

## MEMORANDUM OPINION AND ORDER

On August 9, 2012, Defendant Cimarex Energy Co. ("Defendant" or "Cimarex") filed a Motion to Dismiss (ECF No. 4) under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Plaintiffs Harvey E. Yates Company, Jalapeno Corporation, and Yates Energy Corporation (collectively, "Plaintiffs") oppose the motion. This Court, having considered the pleadings, motion, briefs, relevant law, and otherwise being fully advised, concludes that the motion to dismiss should be granted under Rule 12(b)(6) as to Plaintiffs' claim for prima facie tort and request for injunctive relief but denied in all other respects.

**I.     STANDARD**

Under Federal Rule of Civil Procedure 12(b)(1), a court may dismiss a case for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A motion made under Rule 12(b)(1) may go beyond the allegations of the complaint and challenge facts upon which subject matter jurisdiction depends. *Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1295 (10th Cir. 2003).

"When a party challenges the allegations supporting subject-matter jurisdiction, the court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts." *Id.* at 1296 (internal quotations omitted). A court's reference to such evidence when ruling on a Rule 12(b)(1) motion does not convert the motion to dismiss to a Rule 56 motion for summary judgment. *Id.*

The Court can also dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A plaintiff's complaint must set forth factual allegations that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). It is not enough for a plaintiff to just set forth labels, conclusions, and formulaic recitation of the elements of a cause of action. *Id.* When reviewing a plaintiff's complaint in ruling on a Rule 12(b)(6) motion, the Court must accept all well-pleaded allegations as true. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). The Court must view the allegations in the light most favorable to the plaintiff. *Id.* The Court "will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012). This plausibility standard does not require evidence of probability, "but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although presented as a motion to dismiss under the *Iqbal* standard, Defendant has attached a number of exhibits in support of its motion. Plaintiffs responded in kind, filing a Supplement with Exhibits A through I in support of their response to the motion to dismiss. *See* Pls.' Supp., ECF No. 15. Both parties argue that their respective exhibits are properly considered by the Court on a motion to dismiss because they are administrative orders, other documents in

the official record of administrative proceedings, or other public documents that are subject to

judicial notice and/or are incorporated by reference in the complaint.

Federal Rule of Civil Procedure 12(d) applies when a party presents matters outside the

pleadings:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are
> presented to and not excluded by the court, the motion must be treated as one for
> summary judgment under Rule 56.  All parties must be given a reasonable
> opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d).  Under Rule 12(d), a court has broad discretion to refuse to accept the

extra-pleading materials and resolve the motion solely on the basis of the pleading itself.  *See*

*Lowe v. Town of Fairland,* 143 F.3d 1378, 1381 (10th Cir. 1998).  Reversible error may occur if

a court considers matters outside the pleadings but fails to convert the motion to dismiss into a

motion for summary judgment.  *Id.*

No conversion is required, however, when the court considers information that is subject

to proper judicial notice or documents incorporated into the complaint by reference and central to

the plaintiff's claim, unless their authenticity is questioned.  *See Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as

well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss,

in particular, documents incorporated into the complaint by reference, and matters of which a

court may take judicial notice."); *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir.

2012) ("A motion under Rule 12(b)(6) can be based only on the complaint itself, documents

attached to the complaint, documents that are critical to the complaint and referred to in it, and

information that is subject to proper judicial notice."); *Pace v. Swerdlow*, 519 F.3d 1067 (10th

Cir. 2008) (explaining that court may properly consider on motion to dismiss documents central

to plaintiff's claim and referred to in complaint, where document's authenticity is not in dispute);

*Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (noting that no conversion is required

when a court takes judicial notice of its own files and records and facts that are matter of public

record).  The documents, however, "may only be considered to show their contents, not to prove

the truth of matters asserted therein."  *Tal*, 453 F.3d at 1264 n.24 (quoting *Oxford Asset Mgmt.,

Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002)).   A plaintiff has more flexibility opposing

a Rule 12(b)(6) motion and may submit materials outside the pleadings to illustrate facts the

party expects to be able to prove, so long as the elaborations are consistent with the pleadings.

*Geinosky*, 675 F.3d at 745 n.1.

      The  Court  will  not  convert  Defendant's  motion  to  dismiss  into  one  for  summary

judgment.  Therefore, the following facts are those set forth in the complaint in the light most

favorable to Plaintiffs, as well as the facts set forth in the exhibits attached by the parties that are

properly the subject of judicial notice or that are documents referred to in Plaintiffs' complaint

and central to their claims.[1]

---

[1]      Plaintiffs argue the Court may consider the orders, official record, and the transcripts of
the Oil Conservation Division and Oil Conservation Commission proceedings because they are
incorporated by reference into Plaintiff's complaint and are matters of public record.  The Court
agrees that the orders and records may be considered to show their contents, but that they may
not be used to prove the truth of the matters asserted therein.  *See Tal*, 453 F.3d at 1264 n.24;
*Oxford Asset Mgmt.*, 297 F.3d at 1188 (explaining that court on motion to dismiss could consider
contents of public disclosure documents that are required to be filed with SEC but that
documents may be considered only to show their contents, not to prove the truth of matters
asserted therein).   Consequently, the Court may consider an order of the Oil Conservation
Division to show what the division concluded, but the Court cannot rely on the findings
contained in the Order to prove the truth of those underlying matters.
      Plaintiffs in their response also cite extensively to the transcript of the Oil Conservation
Division hearing held on November 4, 2010.  *See* Pls.' Supp., Ex. A, ECF No. 15-1.  In many
instances, Plaintiffs cite the transcript to prove the facts asserted by the testifying witness as true.
Because the proceedings were referenced in the complaint, the Court may consider the transcript
of the hearing for the purpose of showing that a hearing occurred on the particular subject matter,
but the Court cannot use the hearing transcript to prove the truth of the matters asserted therein
without converting the motion to dismiss into one for summary judgment.  *Tal*, 453 F.3d at 1264
n.24; *Oxford Asset Mgmt.*, 297 F.3d at 1188.  The Court will therefore not consider facts testified

## II.    FACTUAL BACKGROUND

Plaintiffs were working interest owners of oil and gas interests in the S/2 of Section 21, Township 19 South, Range 31 East, NMPM, Eddy County, New Mexico, (hereinafter "South Half of Section 21"), subject to a May 1, 2003 Joint Operating Agreement between Plaintiffs and Lynx Petroleum Consultants, Inc. ("Lynx").   Compl. ¶ 8, ECF No. 1-1.   Lynx is Plaintiffs' designated operator.   *Id.* ¶ 19.   Defendant was a working interest owner and operator of oil and gas interests in the north one-half (N/2) of Section 21, Township 19 South, Range 31 East, NMPM, Eddy County, New Mexico (hereinafter "North Half of Section 21").   *Id.* ¶ 9. Defendant's interest was a term assignment with an expiration date of April 28, 2010. *Id.* ¶ 10.

Defendant knew or had reason to know that the potential for oil and gas reserves underlying the South Half of Section 21 was greater than that of the North Half of Section 21. *Id.* ¶ 12.   Defendant thus developed a plan to utilize the regulatory process of the New Mexico Oil Conservation Division of the Energy, Minerals and Natural Resources Department ("Oil Conservation Division" or "Division") to invade the higher oil and gas reserves of the South Half of Section 21 by forming non-standard proration units, starting with the W/2W/2 of Section 21, in order to combine its acreage in the North Half of Section 21 with the acreage in the South Half of Section 21.   *Id.* ¶ 13.   Defendant intended to receive a more favorable and disproportionate allocation of oil and gas reserves attributable to its interests.   *Id.* ¶ 31.

In November 2009, Defendant proposed the drilling of the Penny Pincher Federal Com. 21 No. 1H well ("Penny Pincher No. 1") to recover oil and gas production from the Bone Springs Formation.   *See id.* ¶ 14.   Penny Pincher No. 1 "would be dedicated to the W/2W/2 of Section 21 to be drilled vertically in the NW/4NW/4 of Section 21 to a downhole point, then

---

to in the hearing to prove the truth of the matter asserted therein, unless those same facts are alleged in the complaint or subject to judicial notice.

deviated horizontally, the terminus of which would be in the SW/4SW/4 of Section 21." *Id.*

Defendant sent proposal letters for Penny Pincher No. 1 to interest owners requesting voluntary

participation in the drilling of the well, or alternatively, Defendant gave notice that it was

prepared to use forced pooling options, if necessary.[2]  *See* Pls.' Supp., Ex. B, ECF No. 15-2.[3]

"Because some of the working interest owners of the S/2 of Section 21, including Plaintiffs,

considered the S/2 of Section 21 as having greater potential for oil and gas production,

Defendants and other interest owners in the S/2 of Section 21 did not agree to join in the

proposal to drill the Penny Pincher No. 1, as proposed by Defendant."  Compl. ¶ 15, ECF No. 1-

1.[4]

---

[2]      The term "pooling" involves "the combination of several small tracts of land to meet the spacing requirements for a single well."  *Amoco Prod. Co. v. Heimann*, 904 F.2d 1405, 1411 n.3 (10th Cir. 1990).

[3]      Plaintiffs' Exhibit B is a November 10, 2009 letter from Defendant to Lynx setting forth its drilling proposal.  The Court will consider this exhibit for its contents, because Plaintiffs referred to Defendant's proposal in paragraphs 14 and 15 of the Complaint, and thus, the document was incorporated into the complaint by reference.  *See Tellabs*, 551 U.S. at 322; *Tal*, 453 F.3d at 1264 n.24.

[4]      Defendant alleges in its motion to dismiss that several of the owners of the oil and gas working interests in Section 21, including owners in the South Half of Section 21, consented to Defendant's proposal and executed a Joint Operating Agreement dated November 10, 2009. Def.'s Mot. 3, ECF No. 4.   As evidence, Defendant attached the November 10, 2009 Memorandum of Operating Agreement as Exhibit 3 (ECF No. 4-3), arguing it is a real property record subject to judicial notice.  Plaintiffs in their response, however, allege that "[a]ll interest owners in the South Half of Section 21, including Plaintiffs, declined Defendant's proposal." Pls.' Resp. 4, ECF No. 14.  In Plaintiffs' Complaint, Plaintiffs allege that "other interest owners in the S/2 of Section 21 did not agree to join in the proposal."  Compl. ¶ 15, ECF No. 1-1.  It is unclear whether "other interest owners" mean *all* interest owners or *some* interest owners, but this Court must construe inferences in Plaintiffs' favor.  Consequently, there is a question of fact concerning whether all interest owners declined Defendant's November 2009 proposal at the time, or if only Plaintiffs and some interest owners declined the proposal.  At this stage, the Court must presume the facts of the complaint are true, and therefore, the Court will not rely on public documents where the truth of the matters contained therein is in dispute.  *Cf. Morgan v. Ocwen Loan Servicing, LLC*, 795 F.Supp.2d 1370, 1374 n.4 (N.D. Ga. 2011) ("Defendants assert that the Court may consider documents referenced in the complaint, including the promissory note and the purported assignment of the security deed to Ocwen, without converting this motion to a motion for summary judgment.  However, Defendants are attempting to use these documents

In February 2010, Defendant also proposed development of the remaining portion of Section 21 by proposing the drilling of three additional wells to the Bone Springs Formation: Penny Pincher No. 2, dedicated to the E/2W/2 of Section 21; Penny Pincher No. 3, dedicated to the W/2E/2 of Section 21; and Penny Pincher No. 4, dedicated to the E/2E/2 of Section 21. Compl. ¶ 21, ECF No. 1-1.  Plaintiffs declined to participate in the drilling of the three additional wells.  *Id.* ¶ 22.  Because Plaintiffs and other working interest owners in the South Half of Section 21 did not agree to drill Penny Pinchers Nos. 2, 3, and 4, Defendant filed three additional applications for compulsory pooling and non-standard spacing units.  *Id.* ¶ 25.

All four wells proposed by Defendant were horizontally oriented from north to south, such that drainage of oil and gas reserves through the horizontal lateral portion of the wells would be greater from the South Half of Section 21, due to lower reserves in the North Half of Section 21, and because of the curvature of the well as it changes from a vertical to a horizontal component to intersect the producing formation.  *Id.* ¶ 23.  Had Defendant really believed that the two halves of Section 21 were potentially equal in reservoir quality, the wells would have had reciprocal orientations, in other words, two wells oriented north-south and two other wells oriented south-north, to more efficiently recover the reserves underlying the entirety of Section 21.  *Id.* ¶ 24.

**Penny Pincher Nos. 1 and 2**

In January 2010, Defendant filed a compulsory pooling application with the Oil Conservation Division and requested approval of a non-standard spacing unit comprised of the

---

to dispute a central factual allegation of Plaintiff's complaint, compared to the securities cases wherein courts have considered on a motion to dismiss documents required to be filed with the SEC of which the contents, and not the truth, were at issue.  The Court must therefore assume at this motion to dismiss stage of the proceedings that Ocwen is not the holder of the note, based on the allegations of Plaintiff's complaint.") (internal citations omitted).

W/2W/2 of Section 21 for the Penny Pincher No. 1 well. *See id.* ¶ 16. A standard spacing unit for a vertical well to test the Bone Spring Formation would have consisted of 40 acres, or the NW/4NW/4 of Section 21, for the vertical component of the Penny Pincher No. 1. *Id.* ¶ 17. Defendant, alternatively, could have formed east/west non-standard proration units covering the North Half of Section 21, without resorting to compulsory pooling or inclusion of interest in the South Half of Section 21. *Id.*

Lynx, Plaintiffs' designated operator, challenged the application for the Penny Pincher No. 1 well before the Oil Conservation Division. *See id.* ¶ 19. The Oil Conservation Division held a hearing on the application on February 4, 2010. Pls.' Supp., Ex. C ("Order of the Division"), ECF No. 15-3 at 1 of 7.[5] According to the Division Order, a representative of Lynx stated at the hearing that he was appearing on behalf of himself, Lynx, Marbob Energy Corporation, Harvey E. Yates Company, OXY USA, and several other interest owners. *See* Order of the Division, ECF No. 15-3 at 3 of 7. On March 18, 2010, the Oil Conservation Division granted Defendant's application to form a non-standard 160-acre spacing unit comprised of the W/2W/2 of Section 21 for Defendant's Penny Pincher No. 1 well. *See* Compl. ¶ 18, ECF No. 1-1; Order of the Division, ECF No. 15-3 at 5 of 7. In the Order, the Oil Conservation Division issued a finding that Defendant acquired interest in the North Half of Section 21, but did not have any interest in the South Half of Section 21. *See* Order of the Division, ECF No. 15-3 at 2 of 7. After concluding that the non-standard unit will enable the drilling of the well that will most efficiently produce the reserves underlying the Unit, thereby

---

[5]     This Court may consider the contents of the Oil Conservation Division orders because they were incorporated into the complaint by reference and are matters of public record. *See Tellabs*, 551 U.S. at 322; *Tal*, 453 F.3d at 1264 n.24.

preventing waste, and protecting correlative rights,[6] the Oil Conservation Division ordered the pooling of all uncommitted interests in the oil and gas in the Bone Spring Formation underlying the project area and designated Defendant the operator of the proposed well and of the Unit.  *See id.* at 4-6 of 7.  Lynx subsequently sought *de novo* review of the March 18, 2010 Order with the New Mexico Oil Conservation Commission.  Compl. ¶ 19, ECF No. 1-1.

On March 20, 2010, Defendant began drilling the Penny Pincher No. 1 well, prior to final rulings by the Oil Conservation Commission.  *See id.* ¶ 20; Def.'s Mot., Ex. 5 ("Bureau of Land Management Well Completion or Recompletion Report and Log"), ECF No. 4-5 at 1 of 2.[7]  In April 2010, Defendant finished the vertical component of the Penny Pincher No. 1 well.  *See* Def.'s Mot., Ex. 5, ECF No. 4-5 at 1 of 2.  On April 21, 2010, Defendant signed an operating agreement purportedly conveying oil and gas operating rights and working interest production in the South Half of Section 21 with EGL Resources, and on April 28, 2010, Defendant signed an operating agreement purportedly conveying oil and gas operating rights and working interest production in the South Half of Section 21 with Marbob Energy Corporation.  *See* Compl. ¶ 34, ECF No. 1-1; Defs.' Mot., Ex. 1 and 2, ECF No. 4-1 and 4-2.[8]  Defendant completed drilling the

---

[6]    The term "correlative rights" means rights that one owner possesses in a common source of supply in relation to those rights possessed by other owners in the same common source of supply.  *Heimann*, 904 F.2d at 1411 n.4.

[7]    This Court will consider the dates of well completion set forth in the Bureau of Land Management ("BLM") Well Completion or Recompletion Report and Log because it is a public record, the complaint referenced that Defendant began drilling the Penny Pincher No. 1 prior to final rulings of the Oil Conservation Commission, and Plaintiffs do not dispute the accuracy of the dates of completion of the various portions of the well and rely on the same dates in their response.  *See* Pls.' Resp. 5, ECF No. 14; *Tellabs*, 551 U.S. at 322; *Tal*, 453 F.3d at 1264 n.24. The Court will thus consider the dates without converting the motion to dismiss to one for summary judgment.

[8]    Exhibits 1 and 2 are the respective Term Assignments to the rights, title, and interests in the oil and gas operating rights and working interest production in the lease covering the South Half of Section 21 conveyed to Defendant by EGL Resources on April 21, 2010, and by Marbob Energy Corporation on April 28, 2010, respectively.  *See* Def.'s Mot. Ex. 1 and 2, ECF No. 4-1

9

Penny Pincher No. 1 in August 2010.  *See* Def.'s Mot., Ex. 5, ECF No. 4-5 at 1 of 2; Pls.' Resp.

6, ECF No. 14.  Defendant ultimately obtained oil and gas production on the Penny Pincher No.

1 well.  *See* Compl. ¶ 20, ECF No. 1-1.

      The *de novo* appeal of the Penny Pincher No. 1 approval and the application for the

Penny Pincher No. 2 were consolidated before the Oil Conservation Commission.  *Id.* ¶ 27.  On

November 4, 2010, Defendant attended the hearing before the Oil Conservation Commission on

the consolidated applications.  *Id.* ¶ 28.  On December 20, 2010, the Oil Conservation

Commission denied Defendant's applications for the Penny Pincher Nos. 1 and 2 wells, holding

that the applications, if approved, would not afford the owners of the respective tracts the

opportunity to recover their just and fair share of the oil and gas located in the proposed unit

based on the significant disparity in the reservoir quality of the Bone Springs Formation

underlying the NW/4 and the much more superior SW/4 of Section 21.  *Id.* ¶ 29.  The

Commission found that there were disparate interests in the proposed project areas, such that

allocation on a straight acreage basis would violate correlative rights by not allowing other

interest holders to receive their just and fair shares of production.  *Id.* ¶ 30.  Defendant appealed

the decision to the First Judicial District Court, but has since voluntarily dismissed its appeal.  *Id.*

---

and 4-2.  The Court will consider these exhibits for their contents, but not for the truth of the matters asserted therein, because Plaintiffs in their Complaint alleged that Defendant acquired oil and gas working interests in the South Half of Section 21, *see* Compl. ¶ 34, ECF No. 1-1 ("Defendant has, in the interim, acquired oil and gas working interests in the S/2 of Section 21"); they are recorded public documents; and Plaintiffs have not opposed the Court's consideration of these documents for the purpose of showing that Defendant signed the respective operating agreements with EGL Resources and Marbob Energy Corporation on those respective dates.  *See* Pls.' Resp. 5, ECF No. 14.  Plaintiffs, however, dispute the validity of the Term Assignments, and thus, the Court will not consider them for the truth of the matter asserted therein.

      Plaintiffs assert in their response that Defendant also entered into an operating agreement with the Bass Group and cite to the November 4, 2010 hearing transcript for support.  The Court will not consider that evidence, because the Court is not permitted to consider the transcript for the truth of the matters contained therein, Plaintiffs did not attach the agreement with the Bass Group or other public record to prove that fact, and it is not clear that the fact is undisputed.

¶ 32.

Defendant has nonetheless continued to operate the Penny Pincher No. 1 well.  *Id.* ¶ 33. Defendant has not yet drilled Penny Pincher No. 2.  *See id.* ¶¶ 39, 60 (discussing only drilling of Penny Pincher Nos. 1, 3, and 4 and seeking injunctive relief to prevent further operation of only those three wells); Def.'s Mot. 7, ECF No. 4; Pls.' Resp. 7, ECF No. 14.

**Penny Pincher Nos. 3 and 4**

Plaintiffs anticipated challenging all three applications for Penny Pincher Nos. 2, 3, and 4 in one consolidated proceeding; however, the applications for Penny Pincher Nos. 3 and 4 were bifurcated and Plaintiffs were unable to participate.  Compl. ¶ 26, ECF No. 1-1.  Following a June 10, 2010 hearing, the Oil Conservation Division entered Orders on June 28, 2010, approving the Penny Pincher Nos. 3 and 4 wells.  *See id.*; Pls.' Supp., Ex. D-1, ECF No. 15-4 & Ex. D-2, ECF No. 15-5. [9]  In the Orders, the Oil Conservation Division noted that due public notice had been given and that the Harvey E. Yates Company entered an appearance through counsel but did not oppose the application.  Pls.' Supp., Ex. D-1, ECF No. 15-4 at 1-2 of 6 & Ex. D-2, ECF No. 15-5 at 1-2 of 6.[10]  Defendant commenced oil and gas production of Penny Pincher Nos. 3 and 4.  *See* Compl. ¶¶ 39, 58, and 60.

### III.   PROCEDURAL HISTORY

On July 3, 2012, Plaintiffs filed suit against Defendant in the Fifth Judicial District Court,

---

[9]     This Court may consider the Oil Conservation Division's orders because they were incorporated into the complaint by reference and are matters of public record.  *See Tellabs*, 551 U.S. at 322; *Tal*, 453 F.3d at 1264 n.24.

[10]     The Court includes this evidence for its contents only, not to prove the truth of what the Division stated.  As explained *infra*, Plaintiffs' Complaint alleges that Plaintiffs were unable to participate in the hearing, and thus, this Court will defer to the contents of the Complaint at this stage.   Defendant also asserts in its motion that Jalapeno Corporation and Yates Energy Corporation are affiliates of Harvey E. Yates Company, but Defendant cites no evidence to support these allegations, and the allegations are not made in the Complaint.  The Court will therefore not consider them.

State of New Mexico, for damages, accounting, and injunctive relief in a seven-count complaint. *See* Compl., ECF No. 1-1.  In Counts One and Two, Plaintiffs assert claims for trespass and bad faith trespass, respectively, asserting that, through the drilling of Penny Pincher Nos. 1, 3, and 4, Defendant intentionally and purposely entered and invaded Plaintiffs' oil and gas real property interests, without sufficient permission, and commenced oil and gas production therefrom.  *Id.* ¶¶ 35-43.  Plaintiffs allege that Defendant's conduct was willful, wanton, and in bad faith to deprive Plaintiffs of their oil and gas reserves.  *Id.* ¶ 42.  In Count Three, Plaintiffs assert a claim for conversion, alleging that Defendant intentionally and wrongfully exercised dominion and control over Plaintiffs' oil and gas reserves by producing and extracting the reserves and have converted such reserves or proceeds therefrom for its own use without Plaintiffs' consent.  *Id.* ¶¶ 44-48.  In Count Four, Plaintiffs allege tortious interference with Plaintiffs' contractual and business relationship with Lynx to operate the South Half of Section 21.  *Id.* ¶¶ 49-53.  Plaintiffs contend that, despite the fact that Defendant knew of Plaintiffs' contractual and business relationship with Lynx and that Defendant did not own any interests in the South Half of Section 21, Defendant proceeded with its scheme to combine its North Half of Section 21 with the South Half of Section 21 to obtain oil and gas reserves that it did not then own.  *See id.*  Plaintiffs allege in Count Five a claim for prima facie tort.  *Id.* ¶¶ 54-56.  Finally, in Count Six Plaintiffs request an accounting of expenses and the proceeds of the sale of oil and gas production from Penny Pincher Nos. 1, 3, and 4.  *Id.* ¶¶ 57-58.  In Count Seven, Plaintiffs seek "injunctive relief to prevent Defendant from further operation of the Penny Pincher Nos. 1, 3, and 4, without full disclosure and accounting to the Plaintiffs."  *Id.* ¶ 60.

Defendant removed the case before this Court on August 9, 2012.  Notice of Removal, ECF No. 1.  Defendant subsequently moved under Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6) to dismiss all claims in this case based on lack of subject matter jurisdiction and failure to state a claim.  *See* Def.'s Mot., ECF No. 4.  Defendant argues that, as a matter of law, it had the right to drill the South Half of Section 21 without Plaintiffs' consent because it was a co-tenant at the time of the wells' completion and co-tenants have the right to develop oil and gas without the consent of other co-tenants.  Alternatively, Defendant asserts it had the right to develop the wells in question because Defendant completed the wells with the express authorization and permission of Plaintiffs' other co-tenants, and one co-tenant has the right to grant a license to a third party to enter the property without obtaining the consent of other co-tenants.  Defendant contends that its actions were lawful because they were conducted with the express permission and authorization of the Oil Conservation Division, and consequently, Plaintiffs' claims constitute an improper and impermissible collateral attack on the Division's orders.

## IV.    ANALYSIS

The New Mexico Oil and Gas Act, N.M. Stat. Ann. §§ 70-2-1 et seq., among other things, establishes the powers and duties of the Oil Conservation Commission (the "Commission") and Oil Conservation Division (the "Division").  *See* N.M. Stat. Ann. § 70-2-6. According to the Oil and Gas Act, the Oil Conservation Division has "jurisdiction and authority over all matters relating to the conservation of oil and gas," and it has "jurisdiction, authority and control of and over all persons, matters or things necessary or proper to enforce effectively the provisions of this act or any other law of this state relating to the conservation of oil or gas."  *Id.* The basis of the Oil Conservation Commission's powers is founded on the duty to prevent waste and to protect correlative rights.  *See id.* § 70-2-11; *Sims v. Mechem*, 72 N.M. 186, 189, 382 P.2d 183, 185 (1963).  Among other enumerated powers, the Oil Conservation Division has the

authority "to require wells to be drilled, operated and produced in such manner as to prevent injury to neighboring leases or properties," N.M. Stat. Ann. § 70-2-12(B)(7), and to "fix the spacing of wells," *id.* § 70-2-12(B)(10).

For spacing or proration units with divided mineral ownership, gas well operators may either obtain voluntary pooling agreements or apply for an order of the Division pooling the lands dedicated to the spacing unit. *See id.* § 70-2-18(A)-(B). Voluntary pooling agreements seek a formula for participation in expenses and production. *See* 6 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* § 924 (2013). Surface acreage may be an appropriate basis in many pooling agreements; but in other cases geological and other data, considering factors such as the nature of the producing formation, thickness of pay, porosity, permeability, pressure, etc., may indicate another more fair formula. *See id.* §§ 924, 970.1, 970.2. Disagreements as to the proper formula may render impossible any voluntary agreement on pooling. *See id.* § 970.2.

Where parties do not agree to voluntary pooling, the Division has the power to force compulsory pooling:

> Where, however, such owner or owners have not agreed to pool their interests, and where one such separate owner, or owners, who has the right to drill has drilled or proposes to drill a well on said unit to a common source of supply, the division, to avoid the drilling of unnecessary wells or to protect correlative rights, or to prevent waste, shall pool all or any part of such lands or interests or both in the spacing or proration unit as a unit.

> All orders effecting such pooling shall be made after notice and hearing, and shall be upon such terms and conditions as are just and reasonable and will afford to the owner or owners of each tract or interest in the unit the opportunity to recover or receive without unnecessary expense his just and fair share of the oil or gas, or both.

*Id.* § 70-2-17(C). The Division may establish nonstandard spacing or proration units. *Id.* § 70-2-18(C). Any operator failing to obtain voluntary pooling agreements, or failing to apply for an order of the Division pooling the lands dedicated to the spacing unit, shall be liable to account to

14

and pay each owner of mineral or leasehold interest, either the amount to which each interest would be entitled if pooling had occurred or the amount to which each interest is entitled in the absence of pooling, whichever is greater.  *Id.* § 70-2-18(B).

The Division has the authority to hold hearings, and when acting in a judicial capacity, its decision is entitled to preclusive effect.  *See id.* § 70-2-23; *Heimann*, 904 F.2d 1405.  Within 20 days after entry of an order of the commission, an adversely affected party of record may file an application for rehearing.  N.M. Stat. Ann. § 70-2-25(A).  An unsatisfied party of record to the rehearing proceeding may appeal to the district court.  *Id.* § 70-2-25(B).

The Oil and Gas Act also provides for enforcement actions for violations of the Act, or any rule, regulation, or order made thereunder.  *See id.* §§ 70-2-28- to -31.  The Attorney General may bring suit on the Division's behalf to impose civil penalties against any person that is violating or threatening to violate "any statute of this state with respect to the conservation of oil or gas, or both, or any provision of this act, or any rule, regulation or order made thereunder."  *Id.* § 70-2-28.  *See also Marbob Energy Corp. v. New Mexico Oil Conservation Comm'n*, 2009-NMSC-013, ¶¶ 8-12, 146 N.M. 24, 206 P.3d 135.  Section 70-2-29 grants private citizens the right to enforce the Act when the Division does not and clarifies that the Act does not impair any private party's suit for damages:

> Nothing in this act contained or authorized, and no suit by or against the commission or the division, and no penalties imposed or claimed against any person for violating any statute of this state with respect to conservation of oil and gas, or any provision of this act, or any rule, regulation or order issued thereunder, shall impair or abridge or delay any cause of action for damages which any person may have or assert against any person violating any statute of the state with respect to conservation of oil and gas, or any provision of this act, or of any rule, regulation or order issued thereunder.  Any person so damaged by the violation may sue for and recover such damages as he may be entitled to receive.  In the event the division should fail to bring suit to enjoin any actual or threatened violation of any statute of this state with respect to the conservation of oil and gas, or of any provision of this act, or of any rule, regulation or order made thereunder,

then any person or party in interest adversely affected by such violation, and who has notified the division in writing of such violation or threat thereof and has requested the division to sue, may, to prevent any or further violation, bring suit for that purpose in the district court of any county in which the division could have brought suit. . . .

*Id.* § 70-2-29.

### A.    Exhaustion of Administrative Remedies

Defendant argues that this Court lacks jurisdiction as to the claims regarding the Penny Pincher Nos. 3 and 4 wells and as to Plaintiffs' request for injunctive relief as to all wells because Plaintiffs have failed to exhaust their available administrative remedies under the Oil and Gas Act.  "Under the exhaustion of administrative remedies doctrine, [w]here relief is available from an administrative agency, the plaintiff is ordinarily required to pursue that avenue of redress before proceeding to the courts; and until that recourse is exhausted, suit is premature and must be dismissed."  *Smith v. City of Santa Fe*, 2007-NMSC-055, ¶ 26, 142 N.M. 786, 171 P.3d 300 (internal quotation omitted).  The purpose of the exhaustion doctrine is to permit the agency to resolve factual issues within its particular expertise in order to best serve the interests of justice.  *Id.*  However, the exhaustion of administrative remedies "concerns the timing of judicial review of an administrative action and applies only in situations where an administrative agency has original jurisdiction."  *Id.* ¶ 27 (quoting *Summit Prop., Inc. v. Pub. Serv. Co. of N.M.*, 2005-NMCA-090, ¶ 21, 138 N.M. 208, 118 P.3d 716).  *See also Mountain States Natural Gas Corp. v. Petroleum Corp. of Texas*, 693 F.2d 1015, 1019 (10th Cir. 1982) (explaining that exhaustion doctrine applies where question is within agency's specialization and when the administrative remedy will provide the wanted relief).

The New Mexico Oil Conservation Commission and Division have powers to prevent waste and protect correlative rights.  *See* N.M. Stat. Ann. § 70-2-11.  The Oil and Gas Act,

however, does not empower the Commission to determine private causes of action for damages; instead, for private damages actions, district courts retain jurisdiction to determine those suits. *See id.* §§ 70-2-28 through -31; *Marbob Energy*, 2009-NMSC-013, ¶¶ 1, 22-24 (holding that Commission did not have authority to assess civil penalties and impose other sanctions against person who violates Oil and Gas Act; rather, Act requires action in court brought by Attorney General to assess civil penalties or action in court brought by private party to assess damages). *Cf. Grayhorse Energy, LLC v. Crawley Petroleum Corp.*, 245 P.3d 1249, 1254-55 (Okla. Civ. App. 2010) (holding that, although Oklahoma Corporation Commission has limited jurisdiction to resolve public rights in conservation of oil and gas, subject matter jurisdiction rests solely with district court to determine private rights in mineral interests and oil and gas leaseholds); *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 924-25 (Colo. 1997) (explaining that, under nearly identical section of Colorado oil conservation act, language expressly preserves any preexisting common law remedies for damages a person may have against an operator who has violated provision of Act or commission rule).

Because neither the Division nor Commission have jurisdiction to consider Plaintiffs' tort claims for damages, the exhaustion of remedies doctrine does not apply and this Court has jurisdiction to consider Plaintiffs' tort causes of action for damages. *Cf. Greyhound Leasing & Financial Corp. v. Joiner City Unit*, 444 F.2d 439, 445 (10th Cir. 1971) (holding that exhaustion of remedies doctrine did not apply where there was no administrative remedy available by the Oklahoma Corporation Commission for the cause of action asserted). Defendant admits in its reply that the Division and Commission do not have jurisdiction to entertain tort claims, but argues that they have jurisdiction to decide the same issues Plaintiffs raise in this action. While principles of issue preclusion may apply to preclude some or all of Plaintiffs' tort claims for

damages, the doctrine of exhaustion does not.  This Court will consider Defendant's arguments for collateral attack and collateral estoppel in the following section.  The Court will therefore deny Defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1).

In addition to bringing claims for damages, Plaintiffs also seek injunctive relief in Count Seven "to prevent Defendant from further operation of the Penny Pincher Nos. 1, 3, and 4, without full disclosure and accounting to the Plaintiffs."  Compl. ¶ 60, ECF No. 1-1.  Defendant argues that Plaintiffs' injunctive relief claim fails because their Complaint does not contain facts showing that they exhausted the mandatory administrative remedy prior to filing suit.

Section 70-2-29 permits a private party to seek injunctive relief under certain conditions against a defendant who has allegedly violated provisions of the Act, rules, regulations, or orders issued thereunder.  *See* N.M. Stat. Ann. § 70-2-29.  *Cf. Town of Frederick v. North American Resources Co.*, 60 P.3d 758, 765 (Colo. App. 2002) (noting that nearly identical provision in Colorado Oil and Gas Conservation Act allows private parties adversely affected to sue to enjoin violations of commission rules if the commission has failed to do so).  Such a party may bring a private cause of action under the Act for injunctive relief only when the Commission has received written notice of the violation and a request that it bring suit.  *See* N.M. Stat. Ann. § 70-2-29; *Gerrity Oil*, 946 P.2d at 925.

Plaintiffs, in their response, acknowledge, "While the Act does require a party seeking injunctive relief to first request that the [Division] bring the action on behalf of the party, the party is free to bring an equitable action if the [Division] fails to do so.  Pls.' Resp. 9, ECF No. 14.  They assert, without authority, that the exhaustion doctrine is a matter of deference and does not strip a court of jurisdiction.  *Id.*  Plaintiffs do not dispute that they failed to notify the Division in writing; instead, they explain that their "claims for equitable relief are only tangential

to their claims for money damages, as a means to quantify and manage Defendant's continued misconduct." *Id.* Indeed, in Count Seven of their Complaint, Plaintiffs state that they seek "injunctive relief to prevent Defendant from further operation of the Penny Pincher Nos. 1, 3, and 4, *without full disclosure and accounting to the Plaintiffs.*" Compl. ¶ 60, ECF No. 1-1 (emphasis added). Plaintiffs' injunctive relief claim thus appears to be a restatement of their claim for an accounting, rather than a separate request for injunctive relief to shut down the operation of the wells. *See* Pls.' Resp. 8 ("Plaintiffs' request for an accounting and injunctive relief is merely a form of remedy in order to determine the appropriate amount of money damages owed to Plaintiffs."), 10 ("Plaintiffs can be made whole by money damages . . . ."), ECF No. 14. The Court will thus dismiss Plaintiffs' Count Seven for failure to state a claim for relief separate from their requests for an accounting and damages.[11]

### B.      Collateral Attack and Collateral Estoppel

Defendant next argues Plaintiffs cannot state a tort claim because the claims amount to an impermissible collateral attack on the Oil Conservation Division's Orders that permitted the compulsory pooling and non-standard spacing units that allowed for the drilling of the Penny Pincher Nos. 1, 3, and 4. Defendant contends that the collateral estoppel doctrine precludes the re-litigation of the issues considered and decided by the Division. Plaintiffs respond that their

---

[11]      Moreover, as pled, Plaintiffs' claims are based not only on Defendant's failure to get Plaintiffs' approval or consent to drill, but also on its failure to obtain permission of the Division and Commission. *See, e.g.*, Compl. ¶ 33, ECF No. 1-1 ("Defendant has nonetheless continued to operate the Penny Pincher No. 1 well *without regulatory* or contractual authority to pool, produce, otherwise account to Plaintiffs as to their interests in the well.") (emphasis added); Pls.' Resp. 2, ECF No. 14 ("Plaintiffs' Complaint sets forth factual allegations that Defendant intentionally invaded and acted in contravention to Plaintiffs' real property interests, without permission or consent of Plaintiffs, the Oil Conservation Division, or the Oil Conservation Commission . . . ."). To the extent Plaintiffs were attempting to plead a separate claim for injunctive relief that arises from having been adversely affected by a violation of the rules, regulations, or orders of the Commission and Division, that injunctive relief request would be subject to dismissal on the additional ground of failure to exhaust administrative remedies.

tort claims, while related to the Division's orders, do not seek to reconsider the orders themselves.  Rather, Plaintiffs contend they seek money damages arising out of Defendant's actions.  As to Penny Pincher Nos. 1 and 2, Plaintiffs assert that their claims for damages are consistent with the Commission's decision to deny the non-standard wells.  In regard to Penny Pincher Nos. 3 and 4, Plaintiffs argue that, notwithstanding the Division's approvals, Defendant was aware that the parties were subject to a pre-existing operating agreement with Plaintiffs covering the same area and that its conduct of inducing and entering into contracts with certain interest owners in the South Half of Section 21 gives rise to Plaintiffs' tort claims.

A defendant may properly raise the affirmative defense of collateral estoppel in a rule 12(b)(6) motion when the facts necessary to support the defense are apparent from the face of the pleadings or when there is no disputed issue of fact.  *See, e.g.*, *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984) (res judicata defense may be raised by motion to dismiss where defense raises no disputed issues of fact); *Miller v. Shell Oil Co.*, 345 F.2d 891, 893 (10th Cir. 1965) ("[A] defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule."); 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1277 (3d ed. 2004) (listing cases allowing affirmative defenses to be presented in motions to dismiss where facts supporting defense appear on face of complaint or there was no factual dispute).  The party asserting collateral estoppel through a motion to dismiss may also request the court to take judicial notice of records in the prior case.  *Merswin v. Williams Companies, Inc.*, 364 F. App'x 438, 441 (10th Cir. Feb. 3, 2010) (unpublished decision).  *See also Q Int'l Courier, Inc. v. Smoak*, 441 F.3d 214, 216 (4th Cir. 2006) ("When entertaining a motion to dismiss on the ground of res judicata, a court may take judicial notice of facts from a

prior judicial proceeding when the res judicata defense raises no disputed issue of fact.").  If the defendant establishes a prima facie case for collateral estoppel, the burden shifts to the party opposing collateral estoppel to show that he was not afforded a fair opportunity to litigate the issue in the prior proceeding.  *See Padilla v. Intel Corp.*, 1998-NMCA-125, ¶ 9, 125 N.M. 698, 964 P.2d 862.  "Federal courts must apply the law of the state rendering the judgment to determine its collateral estoppel effect."  *Heimann*, 904 F.2d at 1417.

"A collateral attack is 'an attempt to avoid, defeat, or evade [a judgment], or deny its force and effect, in some incidental proceeding not provided by law for the express purpose of attacking' the judgment."  *Lewis v. City of Santa Fe*, 2005-NMCA-032, ¶ 10, 137 N.M. 152, 108 P.3d 558 (quoting *Lucus v. Ruckman*, 59 N.M. 504, 509, 287 P.2d 68, 72 (1955)).  Collateral estoppel fosters judicial economy by preventing the re-litigation of ultimate facts or issues actually and necessarily decided in a prior adjudication.  *See Shovelin v. Central New Mexico Elec. Co-op., Inc.*, 115 N.M. 293, 297, 850 P.2d 996, 1000 (1993).  To invoke collateral estoppel, the moving party must demonstrate that (1) the party to be estopped was a party to the prior proceeding, (2) the cause of action is different from the cause of action in the prior adjudication, (3) the issue was actually litigated in the prior adjudication, and (4) the issue was necessarily determined in the prior litigation.  *Id.*  "[A]dministrative adjudicative determinations may be given preclusive effect if rendered under conditions in which the parties have the opportunity to fully and fairly litigate the issue at the administrative hearing."  *Id.* at 298, 850 P.2d at 1001.

The Tenth Circuit has previously given preclusive effect to a New Mexico Oil Conservation Commission order after finding that the Commission acted in a judicial capacity, resolved facts properly before it, and the parties had an adequate opportunity to litigate the issues

through trial-like procedures.  *See Heimann*, 904 F.2d at 1414-17.   Once the Division or Commission has entered an order, it cannot be collaterally attacked in the district court.  *See id.* at 1417 ("This court previously has recognized that decisions by state oil conservation agencies may be entitled to collateral estoppel effect. . . . Other circuits have also recognized that unitization orders by state oil conservation agencies must remain inviolate to collateral attack.").

"However, a pooling order, or other OCC order, does not immunize the operator, or other parties connected to the pooling order, from lawsuits in the district courts."  *Grayhorse Energy, LLC v. Crawley Petroleum Corp.*, 245 P.3d 1249, 1254 (Okla. Civ. App. 2010) (referring to Oklahoma Corporation Commission that oversees conservation of oil and gas).  *See also Snyder Ranches, Inc. v. Oil Conservation Comm'n of State of N.M.*, 1990-NMSC-090, ¶ 8, 110 N.M. 637, 798 P.2d 587 ("The State of New Mexico may be said to have licensed the injection of salt water into the disposal well; however, such license does not authorize trespass.  The issuance of a license by the State does not authorize trespass or other tortious conduct by the licensee, nor does such license immunize the licensee from liability for negligence or nuisance which flows from the licensed activity.").  Accordingly, district courts are without power to reverse, modify, or correct Commission orders, but they have the power to adjudicate the legal effect of a Commission order when necessary to resolve a dispute over private rights.  *See Grayhorse Energy*, 245 P.3d at 1254.   If a claim does not challenge the Commission's findings or conclusions, it is not barred as a collateral attack on a Commission order.  *Fransen v. Conoco, Inc.*, 64 F.3d 1481, 1489-90 (10th Cir. 1995).  *See also Heimann*, 904 F.2d at 1417 ("But where a subsequent action does not directly or indirectly challenge a previous order by a state oil conservation commission, collateral estoppel and res judicata do not attach.").

### 1.      Penny Pincher Nos. 3 and 4

Turning first to the Penny Pincher Nos. 3 and 4, the Division's final order approved the non-standard spacing and proration units for those wells and pooled the interests in the oil and gas in the project area.  For the collateral attack doctrine to preclude Plaintiffs' claims arising from the drilling of these two wells, Defendant must show that Plaintiffs' tort claims are an attempt to collaterally attack those orders and must meet the elements necessary to establish the affirmative defense of collateral estoppel.  Defendant contends that the terms of the Complaint and the Orders of the Division, which this Court may consider, establish that Plaintiffs received proper notice of Defendant's applications, Plaintiff Harvey E. Yates Company participated in the hearing, the same issues and facts Plaintiffs raise here were litigated and determined by the Division, and the Division authorized the drilling and completion of the Penny Pincher Nos. 3 and 4.

Defendant cannot show at this motion to dismiss stage that collateral estoppel applies to the orders approving Penny Pincher Nos. 3 and 4, because there is a dispute of fact as to whether Plaintiffs were parties or privies with the original parties to the Division proceedings.  *See Lewis*, 2005-NMCA-032, ¶ 15 (explaining that even if administrative appeal could be characterized as a collateral attack on stipulated dismissal and settlement, propriety or impropriety of attack would turn upon petitioner's status as party to litigation or person in privity with a party).  Although the Orders of the Division state that due public notice was given and that Plaintiff Harvey E. Yates Company entered an appearance through counsel, Plaintiffs' Complaint alleges that "because the applications for the Penny Pincher Nos. 3 and 4 were bifurcated and approved in a separate proceeding, Plaintiffs were unable to participate."  Compl. ¶ 26, ECF No. 1-1.  The allegations of the Complaint create a dispute of fact as to whether Plaintiffs had the requisite notice and opportunity to participate and fully and fairly litigate the issues at the hearing that are required

for the collateral estoppel doctrine to apply.  The face of the Complaint and the documents properly considered by the Court on a motion to dismiss also do not establish the relationship between Plaintiff Harvey E. Yates Company and Jalapeno Corporation and Yates Energy Corporation in order to determine whether the latter two Plaintiffs are in privity with the former. Factual disputes at this stage of the case must be resolved in favor of Plaintiffs.  Furthermore, the Court may only consider outside documents for their content, not for the truth of the matters contained therein.  Given the factual dispute as to whether Plaintiffs were parties or privies of the parties to the Division proceedings, this Court may not apply the collateral estoppel doctrine to preclude Plaintiffs' tort claims that arise from Defendant's actions in drilling the Penny Pincher Nos. 3 and 4.  *Compare Fransen*, 64 F.3d at 1486-87 (relying on statutory proscription against collateral attack and declining to analyze doctrine of collateral estoppel in part because plaintiffs did not take part in the commission proceedings); *with Heimann*, 904 F.2d at 1418 (holding that collateral estoppel doctrine applied where record established that plaintiffs were included among designated parties who sought and obtained rehearing of the Oil Conservation Commission's approval of the unit).

### b.       Penny Pincher Nos. 1 and 2

Unlike the Penny Pincher Nos. 3 and 4, Plaintiffs admit in their Complaint that Lynx, Plaintiffs' designated operator, challenged the application for the Penny Pincher No. 1 before the Division.  *See* Compl. ¶ 19, ECF No. 1-1.  Lynx, however, was ultimately successful before the Commission on its challenge to the well, as the final decision by the Oil Conservation Commission denied approval for the forced pooling of interests and drilling of the non-standard Penny Pincher Nos. 1 and 2.  Plaintiffs agree with the ultimate decision of the Commission and their tort claims arise from their position that the drilling of the non-standard Penny Pincher Nos.

1 and 2 wells would not allow Plaintiffs to develop their just and fair shares of the South Half of Section 21. Plaintiffs' tort claims relating to the drilling of the Penny Pincher No. 1 thus do not attempt to avoid, defeat, evade, or deny the force and effect of the final order of the Commission, nor do they seek to challenge the way in which the Commission decided any particular issue in the administrative adjudication.

Defendant nonetheless contends that, at the time it drilled the well, the Oil Conservation Division had approved the Penny Pincher No. 1 well, and thus, Plaintiffs are collaterally attacking the order under which Defendant acted. The Division Order approving the drilling of the Penny Pincher No. 1, however, did not require immediate drilling. Instead, it provided that Defendant must commence drilling the well on or before March 30, 2011, up to a year after the Division's March 18, 2010 approval. *See* Order of the Division, ECF No. 4-4 at 1, 5 of 7. A week after initial approval, on March 25, 2010, Lynx filed an application for de novo hearing of the Division order. *See* Def.'s Mot., Ex. 10, ECF No. 4-10; Compl. ¶ 19, ECF No. 1-1. Defendant did not finish the vertical component of the Penny Pincher No. 1 until April 2010, and did not complete drilling the entire well until August 2010. *See* Def.'s Mot., Ex. 5, ECF No. 4-5 at 1 of 2; Pls.' Resp. 6, ECF No. 14. Defendant thus was aware months before it completed drilling the Penny Pincher No. 1 that the Division Order might not be the final order of the Commission. Defendant nevertheless took the risk by continuing to drill and produce on the well before receiving final regulatory approval.

Collateral estoppel precludes attacks on final orders or judgments in prior suits or administrative proceedings. *See Lewis*, 2005-NMCA-032, ¶ 10 (stating that collateral attack doctrine applies to judgments); *Reeves v. Wimberly*, 107 N.M. 231, 233, 755 P.2d 75, 77 (Ct. App. 1988) ("Collateral estoppel works to bar the relitigation of ultimate facts or issues actually

and necessarily decided in the prior suit *by a valid and final judgment*.") (emphasis added).

Defendant's actions should not be immunized by the interim order of the Division under these

circumstances.  Because the Division Order was not the Commission's final judgment on the

Penny Pincher No. 1, and Plaintiffs' tort actions arising from the drilling of the Penny Pincher

No. 1 do not attack the ultimate judgment of the Commission, the rule against collateral attacks

does not prevent Plaintiffs from bringing tort claims arising from Defendant's action in drilling

the Penny Pincher No. 1 well.

### C. Whether Plaintiffs Plausibly Stated Individual Tort Claims to Survive Dismissal

#### 1. Trespass

A trespass entitling a plaintiff to damages occurs when a defendant makes an

unauthorized entry upon the plaintiff's land.  *See North v. Public Serv. Co. of New Mexico*, 1980-

NMCA-031, ¶ 4, 94 N.M. 246, 608 P.2d 1128.  *See also* N.M. U.J.I. § 13-1301 (explaining that a

trespasser is a person who enters or remains upon the premises of another without the express or

implied permission of the owner of the premises).  A subsurface trespass is the bottoming of a

well on land of another without his consent, resulting from the drilling of a slant or directional

well, and is as wrongful as surface trespass.  *Continental Resources, Inc. v. Farrar Oil Co.*, 559

N.W.2d 841, 844 (N.D. 1997) (quoting Howard R. Williams & Charles J. Meyers, *Manual of Oil

and Gas Terms* 1211 (8th ed. 1991)).  A bad-faith trespasser is one who knows he does not have

the right to enter.  *See Dexter v. Brake*, 269 P.3d 846, 860 (Kan. Ct. App. 2012).  The issue here

is whether Defendant had permission to enter and develop the oil and gas on the South Half of

Section 21.

Defendant argues that it had the Oil Conservation Division's authorization to initiate

drilling of the Penny Pincher No. 1 and the Division's authorization to drill and produce the

26

Penny Pincher Nos. 3 and 4.  Defendant used the regulatory process and only began drilling operations after receiving authorization from the Division.  Although the Oil Conservation Commission later overturned the Division's order authorizing drilling of Penny Pincher No. 1, it is undisputed that, before production occurred on that well, Defendant entered into Term Assignments with EGL Resources and Marbob Energy Corporation purportedly to acquire oil and gas working interests in the South Half of Section 21.  Defendant argues that these Term Assignments created a relationship of cotenancy between Defendant and Plaintiffs, and that Defendant's status as a cotenant gave it the right to develop the oil and gas in the South Half of Section 21 even without obtaining Plaintiffs' consent.  Alternatively, Defendant asserts that it at least acted with the consent of other cotenants to develop the oil and gas, and that the other cotenants' consent is a defense to a claim for trespass.  Plaintiffs contend that the Term Assignments were invalid because they are in direct conflict with Plaintiffs' pre-existing operating agreement, and thus argue there is a question of fact as to whether Defendant was or is a cotenant of Plaintiffs.

"A cotenancy refers to ownership of property with unity of possession, meaning that each cotenant has a right to possess the whole."  *In re Estate of Duran*, 2007-NMCA-068, ¶ 16, 141 N.M. 793, 161 P.3d 290.  *See also De Mik v. Cargill*, 485 P.2d 229, 233 (Okla. 1971) (explaining that a tenancy in common "relationship exists where property is held by several distinct titles by unity of possession, and is not an estate but a relation between persons, the only essential being a possessory right, as to which all are entitled to equal use and possession").  A tenancy in common is created when the language of the instrument looks toward a division of the property, or provides that it shall be held by two or more persons equally, or when it is given "amongst" or "between" certain persons.  2 Tiffany Real Property § 427 (3d ed. 2013).  A lease of real

property given by one cotenant creates a relationship of cotenancy between that cotenant's lessee and the non-contracting cotenant. *See Williams v. Sinclair Refining Co.*, 39 N.M. 388, 47 P.2d 910, 911 (1935).

"Owners of undivided interests in oil and gas in and under real estate are tenants in common." *De Mik*, 485 P.2d at 233. *See also Britton v. Green*, 325 F.2d 377, 381 (10th Cir. 1963) (explaining that undivided fractional interest holders in oil and gas lease are co-tenants in leasehold estates); *Taylor v. Brindley*, 164 F.2d 235, 240 (10th Cir. 1947) ("The owners of an undivided mineral interest are tenants in common, and each cotenant may lease his interest in the property without the consent of the others."). "Grant of a lease is conveyance of an interest in realty sufficient to establish cotenancy with the lessor." *De Mik*, 485 P.2d at 233. In the case of an oil and gas lease, when a mineral owner negotiates a lease agreement with an oil and gas producer that establishes the allocation of income from the wells located on the property, the "working interest" is the "interest of the producer to exclusively drill, produce, and market the oil or gas on the land." *Dexter v. Brake*, 269 P.3d 846, 859 (Kan. Ct. App. 2012). *See also* 8 Howard R. Williams & Charles J. Meyers, Oil and Gas Law 1158 (2013) (defining "working interest" as the "operating interest under an oil and gas lease" in which the "owner of the working interest has the exclusive right to exploit the minerals on the land; the interest may exist in concurrent ownership with others"). In contrast, a "royalty interest," is the "mineral interest owners' stake in the income received from oil or gas actually produced at the surface, free of production expenses." *Dexter*, 269 P.3d at 859.

A co-tenant has the right to extract minerals from common property without first obtaining the consent of his fellow co-tenants, because each co-tenant has a right to enter upon the common estate and a corollary right to possession. *See Estate of Duncan v. Kinsolving*, 133

N.M. 821, 825, 70 P.3d 1260, 1264 (2003) (noting that cotenant enjoys right of reasonable use, benefit, and possession of common property); *Bellet v. Grynberg*, 114 N.M. 690, 694-95, 845 P.2d 784, 788-89 (1992) (explaining that cotenant has right to explore, drill, develop, and operate an oil well, even in the absence of express or implied consent by another cotenant, because law of oil and gas is designed to further oil and gas exploration and development while at the same time properly allocating monetary risks of keeping oil wells in production); *Williams*, 47 P.2d at 911-12 (explaining that cotenants of property each are entitled to reasonable use, benefit, and possession of common property).  Where, however, a tenant in common produces oil or gas without the consent of other cotenants, the operating cotenant must account to the non-consenting cotenants for the latters' proportionate share of the value of the oil or gas produced, less a proportionate share of the expense of production and marketing, or for the revenues minus expenses.  20 Am. Jur. 2d, *Cotenancy and Joint Ownership* § 61 (2013); *Prairie Oil & Gas Co. v. Allen*, 2 F.2d 566, 573 (8th Cir. 1924).

Plaintiffs argue that whether Defendant was or is a co-tenant of Plaintiffs is a factual issue not yet ripe for determination.  This Court agrees.  Defendant's argument that it was a cotenant or operated with the consent of cotenants and cannot be liable for trespass relies on Plaintiffs' admission in the Complaint that Defendant "acquired oil and gas working interests" in the South Half of Section 21 and on the Term Assignments between Defendant and EGL Resources and Marbob Energy, respectively.  Plaintiffs, however, specifically allege that Defendant did not have sufficient permission or approval to enter and invade Plaintiffs' oil and gas interests and Plaintiffs had a right to exclude all others from their working interest.  Although not the model of clarity, these allegations suggest that the working interest rights Defendant acquired were limited and not sufficient to allow entry and drilling.  The admission that

Defendant "acquired oil and gas working interests" is therefore alone not sufficient to negate Plaintiffs' other allegations that Defendant did not have the right to enter and drill on the South Half of Section 21.  Moreover, Plaintiffs contest the validity of the Term Assignments, arguing that the Term Assignments did not convey on Defendant the unrestricted right to enter and drill, and thus, this Court will not rely on those documents at this motion to dismiss stage.  Finally, the Court notes that the original instruments vesting the subject property rights in EGL Resources and Marbob Energy are not part of the record, and thus it is unclear whether EGL Resources and Marbob themselves are cotenants of Plaintiffs with an unrestricted right to possess the entirety of the South Half of Section 21.

Given the limited record this Court is permitted to consider at the motion to dismiss phase and that the Court must construe Plaintiffs' factual allegations in their favor, the Court cannot conclude that Defendant is a cotenant of Plaintiffs based on the bare mention in the Complaint that Defendant acquired a working interest in the South Half of Section 21.  The determination of whether Defendant was a cotenant or operated with the valid, unrestricted consent of Plaintiffs' cotenants is better left for summary judgment or trial.  The Court will therefore not dismiss Plaintiffs' claims for trespass and bad faith trespass at this time.

### 2.    Conversion

Real property in the form of mineral rights is transformed into personal property when the physical substance is severed from the land, and the wrongful taking of that substance constitutes conversion.  *Townsend v. State ex rel. State Highway Dept.*, 1994-NMSC-014, ¶ 4, 117 N.M. 302, 871 P.2d 958.  To establish conversion, a plaintiff must prove "wrongful possession, or of the exercise of a dominion over it in exclusion or defiance of the owner's right, or of an unauthorized and injurious use, or of a wrongful detention after demand." *Mine Supply,*

*Inc. v. Elayer Co.*, 75 N.M. 772, 773-74, 411 P.2d 354 (1966) (quoting *Ross v. Lewis*, 23 N.M. 524, 169 P. 468).  *See also Security Pacific Fin. Servs. v. Signfilled Corp.*, 1998-NMCA-046, ¶ 15, 125 N.M. 38, 956 P.2d 837 ("Conversion is the unlawful exercise of dominion and control over property belonging to another in defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made.").

Plaintiffs allege in their Complaint that Defendant unlawfully converted the oil and gas reserves or proceeds in the South Half of Section 21 without Plaintiffs' requisite consent.  As explained above, given the limited record this Court is permitted to consider at the motion to dismiss phase, the Court cannot conclude as a matter of law that Defendant is a cotenant of Plaintiffs or that it had an unrestricted leasehold property right conveyed by other cotenants to develop the oil and gas in the South Half of Section 21.  It is thus not clear based on the face of the Complaint that Defendant has a defense to Plaintiffs' claim for conversion.  The Court will therefore not dismiss Plaintiffs' conversion claim at this time.

### 3.    Tortious Interference

To establish tortious interference with a contract, the plaintiff must prove that (1) the defendant had knowledge of the contract between the plaintiff and a third party, (2) the plaintiff was unable to fulfill its contract obligations, (3) the defendant played an active and substantial part in causing the plaintiff to lose the benefits of the contract, (4) plaintiff suffered damages resulting from the breach, and (5) the defendant induced the breach without justification or privilege to do so.  *Deflon v. Sawyers*, 2006-NMSC-025, ¶ 16, 139 N.M. 637, 137 P.3d 577.  A defendant acts without justification or privilege when he acts either with an improper motive or by use of improper means.  *See Ettenson v. Burke*, 2001-NMCA-003, ¶ 14, 130 N.M. 67, 17 P.3d

440 (2000). A court must determine if the defendant's primary motivation for the interference was primarily improper, in which case the defendant has no privilege, or whether the defendant's motivation for the interference was primarily proper, in which case liability should not attach. *See Fikes v. Furst*, 2003-NMSC-033, ¶ 23, 134 N.M. 602, 81 P.3d 545. "The desire to earn a profit is not an improper motive." *Martin v. Franklin Capital Corp.*, 2008-NMCA-152, ¶ 15, 145 N.M. 179, 195 P.3d 24 (citing *Williams v. Ashcraft*, 72 N.M. 120, 122, 381 P.2d 55, 56-57 (1963)). "What may qualify as 'improper means' depends to some degree on context and can include, but is not limited to predatory behavior, violence, threats or intimidation, deceit or misrepresentation, bribery, economic pressure, unfounded litigation, defamation, unlawful conduct, and perhaps violation of business ethics and customs." *Zarr v. Washington Tru Solutions, LLC*, 2009-NMCA-050, ¶ 11, 146 N.M. 274, 208 P.3d 919. "[B]ehavior that is wrongful based on an established standard of a trade or profession" can also constitute improper means. *Bogle v. Summit Inv. Co., LLC*, 2005-NMCA-024, ¶ 21, 137 N.M. 80, 107 P.3d 520.

"A claim for tortious interference with contractual relations that does not induce the breach of an existing contract is in the nature of a claim for interference with prospective business advantage. . . ." *Silverman v. Progressive Broadcasting, Inc.*, 1998-NMCA-107, ¶ 28, 125 N.M. 500, 964 P.2d 61. In cases of prospective contracts, the sole motive test applies. *Zarr*, 2009-NMCA-050, ¶ 7. "New Mexico courts have adopted a view that where a defendant is accused of interfering with a plaintiff's opportunity to enter into prospective contracts, a strong showing must be made that the defendant acted not for legitimate business reasons but from some motive such as personal vengeance or spite." *Id.* ¶ 25. The tort can be accomplished, however, by either an improper motive solely to harm the plaintiff or improper means. *Id.* ¶ 6.

Defendant asserts that Plaintiffs have failed to allege sufficient facts to plausibly state a

claim for interference with contract because they do not allege that Lynx breached its contract with Plaintiffs or that Defendant induced a breach.  Defendant additionally argues that Plaintiffs' allegations do not show that Defendant acted with an improper motive or used improper means. Plaintiffs respond that Defendant was aware that the interest owners of the South Half of Section 21 with whom Defendant entered into contracts were already subject to a pre-existing operating agreement with Plaintiffs covering the same area.  Plaintiffs contend that "Defendant's conduct of inducing and entering into such contracts gives rise to Plaintiffs' tort claims."  Pls.' Resp. 16, ECF No. 14.

The Complaint alleges that Plaintiffs had a joint operating agreement for the South Half of Section 21 and that Lynx was the designated operator.  According to the February 4, 2010 Order of the Division, which the parties agree this Court may consider, Lynx represented Plaintiffs as well as Marbob Energy and several other interest owners during the proceedings. The Division Order designated Defendant the operator of the proposed Penny Pincher No. 1 and of the Unit.  Subsequently, Defendant entered operating agreements purportedly to acquire working interests from EGL Resources and Marbob Energy in the South Half of Section 21, even though Defendant knew that Lynx had appealed the Division Order and was aware that the Commission might overturn the forced-pooling order.  Indeed, after concluding that the non-standard spacing and proration unit would violate Lynx's correlative rights because it would not have the ability to fairly and equitably recover its share of the minerals produced from the well, the Commission overturned the Division Order and denied Defendant's application to pool the interest owners for the Penny Pincher Nos. 1 and 2.  Defendant nonetheless continues to extract the reserves from the Penny Pincher No. 1.  These allegations indicate that Defendant interfered with Lynx's ability to act as operator and develop the oil and gas interests in the South Half of

Section 21 and Plaintiffs and Lynx were unable to fulfill their contractual obligations under the joint operating agreement.   Therefore, contrary to Defendant's argument, the Complaint and other documents the parties presented that are properly considered by this Court contain sufficient, plausible facts that Plaintiffs and Lynx were unable to fulfill their contractual obligations to satisfy the second requisite element to state a claim for tortious interference.

Defendant also argues that Plaintiffs failed to allege facts to show improper motive, arguing that a motive to make a profit is not sufficient to state a claim.   Even assuming Plaintiffs failed to allege an improper motive, allegations of improper means are alone sufficient to establish the element of an absence of justification to induce the breach.   Defendant argues that it could not have acted with improper means because it was exercising its right as a cotenant when it developed the oil and gas reserves.   As explained *supra*, there is a question of fact as to whether Defendant is a cotenant or is operating with the valid consent of other cotenants. Moreover, Plaintiffs allege in the Complaint that Defendant is operating the Penny Pincher No. 1 without regulatory approval and suggest that Defendant improperly and without foundation used the regulatory process of the Division to interfere with Plaintiffs' contract with Lynx.   Under New Mexico law, improper means can include unfounded litigation and violation of business standards and customs.   *See Zarr*, 2009-NMCA-050, ¶ 11.   The Court must construe the factual allegations in Plaintiffs' favor, and thus, is unable to conclude at this juncture that the allegations could not plausibly support the element of improper means.

Finally, in its reply, Defendant raises for the first time the argument that the economic loss rule precludes recovery in tort for purely economic losses where the claims alleged are based on breach of an express or implied contractual duty.   The case relied upon by Defendant for its argument, *In re Consolidated Vista Hills Retaining Wall Litigation*, 1995-NMSC-020, 119

N.M. 542, 893 P.2d 438, describes the economic loss rule as limiting damages for economic losses in commercial settings to contract actions, rather than tort actions, in the context of "economic losses from injury of a product to itself." *Id.* ¶ 26. This case does not involve a defective product, and thus it is not clear that the economic loss rule applies. *Cf. Summit Elec. Supply Co., Inc. v. International Business Machines Corp.*, No. Civ. 07-0431 MCA/DJS, 2009 WL 9087259, at *21 (D.N.M. Sept. 30, 2009) (concluding that economic loss rule did not apply, in part, because case was not a products liability case). In any event, the Court will not determine the validity of this argument because Defendant raised it for the first time in its reply and Plaintiffs have not had an opportunity to address it. *See United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) (explaining that argument raised for first time in reply brief are generally deemed waived); *Okland Oil Co. v. Knight*, 92 F. App'x 589, 607 (10th Cir. 2003) (unpublished decision) ("[D]istrict courts are not required to address arguments and allegations raised for the first time in a reply brief.").

In sum, the Court concludes that Plaintiffs have sufficiently alleged enough facts in their Complaint to state a plausible claim for tortious interference with contract to survive dismissal at this time.

### 4.      Prima Facie Tort

New Mexico is one of "a few jurisdictions recognizing a cause of action for prima facie tort." *Stock v. Grantham*, 1998-NMCA-081, ¶ 37, 125 N.M. 564, 964 P.2d 125 (citing *Schmitz v. Smentowski*, 109 N.M. 386, 394, 785 P.2d 726, 734 (1990)). "The elements of the action are: '(1) an intentional and lawful act; (2) an intent to injure the plaintiff; (3) injury to the plaintiff as a result of the intentional act; (4) and [sic] the absence of sufficient justification for the injurious act.'" *Id.* (quoting *Lexington Ins. Co. v. Rummel*, 1997-NMSC-043, ¶ 10, 123 N.M. 774, 945

P.2d 992).   To determine whether a defendant committed a prima facie tort, the court must balance the malicious intent of the defendant against both the justifications for the injurious act and the severity of the injury.   *Rummel*, 1997-NMSC-043, ¶ 11.   No balancing test is necessary if there is no evidence that the defendant intended to injure the plaintiff.   *Id.*   A plaintiff must show that the defendant actually intended to injure the plaintiff, not just that defendant intended to commit an act that results in injury.   *Id.* ¶ 14.

"The theory underlying prima facie tort is that a party that intends to cause injury to another should be liable for that injury, if the conduct is generally culpable and not justifiable under the circumstances."   *Schmitz*, 109 N.M. at 394, 785 P.2d at 734 (citing Restatement (Second) of Torts § 870 (1977)).   Thus, "[p]rima facie tort is intended to provide a remedy for persons harmed by acts that are intentional and malicious, but otherwise lawful, which 'fall outside the rigid traditional intentional tort categories.'"   *Bogle*, 2005-NMCA-024, ¶ 22 (quoting *Martinez v. N. Rio Arriba Elec. Coop., Inc.*, 2002-NMCA-083, ¶ 24, 132 N.M. 510, 51 P.3d 1164).   As such, prima face tort "should be used to address wrongs that otherwise 'escaped categorization,' but 'should not be used to evade stringent requirements of other established doctrines of law.'"   *Id.* (quoting *Schmitz*, 109 N.M. at 396, 398, 785 P.2d at 736, 738).

Defendant argues that Plaintiffs' prima facie tort claim fails because they cannot show the elements of intent to injure Plaintiffs and absence of justification.   Defendant asserts that Plaintiffs' allegations show that Defendant acted in pursuit of its own business interest without sufficient regard for Plaintiffs' contrary business interests.   Plaintiffs respond that Defendant's profit motive does not justify its motive to harm Plaintiffs by invading their mineral interests to which it had no legitimate right to invade.   The Court agrees with Defendant that Plaintiffs as a matter of law have failed to allege sufficient facts to show an absence of sufficient justification.

Plaintiffs' prima facie tort claim is based on Defendant's proposals and applications before the Oil Conservation Division.  Compl. ¶ 55, ECF No. 1-1.  In Count Five, Plaintiffs admit that Defendant filed the applications "all to Defendants' economic advantage and self-interest."  *Id.* ¶ 55(b).  Acting for one's economic advantage and business interests, however, constitutes a justification for one's actions.  *Cf. Radian Asset Assurance, Inc. v. College of the Christian Brothers of New Mexico*, No. Civ. 09-0885 JB/DJS, 2011 WL 10977180, at *58 (D.N.M. Jan. 24, 2011) (concluding that defendant/counter-plaintiff failed to state counter-claim for prima facie tort where allegations indicated that plaintiff/counter-defendant acted in pursuit of its own business interests).

Furthermore, Plaintiffs acknowledge in their Complaint that the Oil Conservation Division approved the Penny Pincher Nos. 3 and 4.  Consequently, Plaintiffs' assertion of a lack of justification for the proposals is contradicted by their own allegations that the Division approved those proposals and applications.  As to Penny Pincher Nos. 1 and 2, Defendant's proposal and application was initially approved by the Division.  Although the Commission later overturned the Division Order approving the Penny Pincher Nos. 1 and 2, by the time the reversal occurred, Defendant had already completed the Penny Pincher No. 1.  Plaintiffs thus have failed to allege sufficient plausible facts to meet the element of absence of justification for Defendant's actions.

Finally, the allegations supporting Plaintiffs' prima facie tort claim mirror the allegations supporting their trespass, conversion, and tortious interference claims, and thus their prima facie tort claim duplicates the other torts in the complaint and is an improper means of evading the requirements of the doctrines underlying those potential torts.  For all the foregoing reasons, the Court will dismiss Plaintiffs' prima facie tort claim.  *Cf. Stock*, 1998-NMCA-081, ¶ 39 ("As we

37

understand the complaint and Stock's briefs, the claim of prima facie tort is duplicative of her other claims.  But to the extent that it is not, we hold that application of that doctrine in this case would be an improper means of evading proof of essential, and appropriate, elements of those other claims.  We therefore affirm the dismissal of the claim of prima facie tort.").

### 5.      Accounting

Defendant argues that Plaintiffs' "claim" for an accounting in Count Six fails to state a claim because an accounting is a remedy, not an independent claim.  Plaintiffs agree and have clarified that their "request for an accounting . . . is merely a form of remedy in order to determine the appropriate amount of money damages owed to Plaintiffs."  Pls.' Resp. 8, ECF No. 14.  Although Plaintiffs set forth their requested remedy for an accounting in a separate count, rather than in the prayer for relief, given that tort claims will remain in the case, this Court has no need to dismiss as a matter of law Plaintiffs' request for the remedy of an accounting.


**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss (**ECF No. 4**) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.      Defendant's request to dismiss Plaintiffs' claim for injunctive relief in Count Seven is **GRANTED** for failure to state a claim;

2.      Defendant's request to dismiss Plaintiffs' claim for prima facie tort in Count Five is **GRANTED** for failure to state a claim;

3.      In all other respects, Defendant's motion to dismiss is **DENIED**.

4.      Counts Five and Seven are **DISMISSED**.


_____
**UNITED STATES DISTRICT JUDGE**